O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| **ALFREDO FRANCO MCINTOSH,** *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| v. | § | CIVIL ACTION NO. 5:04-cv-120 |
| | § | |
| **CASH B. WILEY, INDIVIDUALLY AND** | § | |
| **D/B/A CASH WILEY EXOTICS; CRAIG** | § | |
| **BRANDS; and RODNEY JEFFEREYS,** | § | |
| | § | |
| *Defendants*. | § | |

**OPINION & ORDER**

Pending before the Court is Defendant Craig Brands' Motion for Summary Judgment as to all of Plaintiffs' claims. [Dkt. No. 71]. Upon due consideration of Defendant's Motion, the responsive filings, and the governing law, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion.

**I.   PROCEDURAL HISTORY AND RELEVANT FACTS**

This suit arises out of a contract for the sale of purebred exotic sheep to Plaintiffs, who are residents of Mexico. [Dkt. No. 71, ¶ 6]. In May of 2003, Plaintiff Alfredo McIntosh, acting on behalf of all Plaintiffs, agreed to purchase 47 Transcaspian Urial sheep from Defendant Cash Wiley, a resident of Texas, [Dkt. No. 71, ¶ 6], at a price of $4,000 per animal, [Dkt. No. 84, ¶ 11]. Defendant Wiley obtained the sheep from Defendant Brands who, in turn, agreed to market the sheep on behalf of Defendant Rodney Jeffereys. [Dkt. No. 71, ¶¶ 6-7].

When, in June of 2004, Plaintiffs took possession of the sheep, they became suspicious that the sheep were in fact not purebred, but rather hybrids, and, thus, less valuable. [Dkt. No. 84, ¶

12]. On August 24, 2004, Plaintiffs filed suit claiming: (1) breach of contract; (2) fraud; (3) breach of implied contract; (4) conversion; (5) assumpsit; (6) unjust enrichment; (7) civil conspiracy; and (8) theft. [Dkt. No. 1]. On May 31, 2006, Defendant Brands filed the Motion for Summary Judgment now before the Court, arguing essentially that whatever complaints Plaintiffs have about the transaction, the record cannot support a of finding of liability against him individually for any of the claims enumerated above. [Dkt. No. 71].

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of identifying specific portions of the record "which [it] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 263 (1986). An issue is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the non-moving party." *Id.* at 261.

The Court reviews the record by drawing all inferences most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Once a moving party has met its burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

Assuming no genuine issue exists as to the material facts, the Court will then decide whether the moving party shall prevail solely as a matter of law. *Id.* The moving party is entitled to judgment as a matter of law if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323.

### III. DISCUSSION

**A. Breach of Contract**

Defendant Brands first argues that summary judgment is warranted as to Plaintiffs' breach of contract claim because there is no evidence in the record to demonstrate that privity of contract existed between himself and Plaintiffs. [Dkt. No. 71 at 4].

It is well settled that, under Texas law, "[p]rivity of contract is a necessary predicate to suit on a contract . . . ." *Interstate Contr. Corp. v. City of Dallas*, 135 S.W.3d 605, 607 (Tex. 2004); *Boy Scouts of America v. Responsive Terminal Systems, Inc.*, 790 S.W.2d 738, 747 (Tex. App.—Dallas 1990, writ granted), *rev'd on other grounds*, ("In contract actions, privity of contract is an essential element of recovery."). Although this axiom has been repeated by Texas courts exhaustively, it is quite a challenge to find a definition of "privity" in the contract context. However, based on how courts have employed the term, the best proxy for privity is simply whether the individual is a *party* to the contract—*i.e.*, whether he is obligated thereby. *See C & C Partners v. Sun Exploration & Production Co.*, 783 S.W.2d 707, 721-22 (Tex. App.—Dallas 1989, writ denied), *overruled in part by Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41, 46 (Tex. 1998) (Since "maintenance of an action for breach of contract generally requires privity between the party damaged and the party sought to be held liable . . .

3

[t]he plaintiff has the burden of proving that the defendant has obligated himself under the contract . . . ."); 14 TEXAS JURISPRUDENCE § 337 (Because "[p]rivity of contract is an essential element of recovery in an action based on a contract theory . . . only the parties to a contract have a right complain of its breach."); BLACK'S LAW DICTIONARY 1237 (8th ed.2004) (defining "privity of contract" as simply "[t]he relationship between the parties to a contract . . . ."); G.H. Treitel, THE LAW OF CONTRACT 538 (8th ed. 1991) ("The doctrine of privity means that a person cannot acquire rights or be subject to liabilities arising under a contract to which he is not a party.").

Although the contract in this case was not a written one, [Dkt. No. 71-15 at 189], it is clear to the Court that Brands was not a party thereto. Rather, the only Defendant who can fairly be deemed to have been in privity with Plaintiffs is Defendant Wiley.

In his deposition, Plaintiff McIntosh states that he, during the preceding years, had contracted with Wiley numerous times for the purchase of various exotic animals. [Dkt. No. 71-16 at 8-9]. According to McIntosh, the arrangement to buy the sheep originated when Wiley contacted him to solicit interest therein, and that McIntosh agreed to buy the sheep from Wiley because he was "the one who came with the offer." [Dkt. No. 71-16 at 23]. By contrast, Plaintiffs have provided no evidence to show that Defendant Brands obligated himself in any way to Plaintiffs, or that Brands even knew of the terms of the sale. According to Defendant Wiley, Brands did not even know the identities of the flock's ultimate recipients, [Dkt. No. 71-15 at 184]. In fact, Plaintiff McIntosh, in his deposition, is uncertain as to whether he has ever even communicated with Defendant Brands before receiving the sheep, and merely alludes to an email possibly sent to him from Brands, to which several photos of the sheep were attached. [*See*, *e.g.*, Dkt. No. 71-16 at 26-27]. Consistent with these facts, Wiley in his deposition agreed that Plaintiffs "did not have

4

a contract with Craig Brands," [Dkt. No. 71-15 at 169], that Wiley's "contract was with [Plaintiffs] and [Plaintiffs] contract was with [Mr. Wiley,]" [Dkt. No. 71-15 at 169], that Brands "was not handling the deal for [Plaintiffs,]" and that "[Plaintiffs] were not Craig [Brands'] clients," [Dkt. No. 71-15 at 181]. Therefore, the record cannot support a finding of contractual privity between Defendant Brands and Plaintiffs.

Plaintiffs nevertheless argue that they have "standing" to sue under one of the narrow privity exceptions reserved for plaintiffs who are "third-party beneficiaries" to the given contract. [Dkt. No. 84-1, ¶ 25]. Plaintiffs argue that they qualify as third-party beneficiaries because Brands and Wiley "contracted with one another with the intent to benefit Plaintiffs by supplying Plaintiffs with a group of alleged Transcaspian Urial [sheep] in possession of Defendant Brands." [Dkt. No. 84, ¶ 25].

It is true that "[a] third party may recover on a contract made between other parties . . . if the parties intended to secure a benefit to that third party." *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (citing *MCI Telecomms. Corp. v. Texas Util. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)). However, Plaintiffs construe the third-party beneficiary exception to the privity rule far too broadly, as it applies "only if the contracting parties entered into the contract *directly* for the third party's benefit." *Id.* (emphasis added). Additionally, "[a] court will not create a third-party beneficiary contract by implication," but rather "an agreement must clearly and fully express an intent to confer a direct benefit to the third party." *Id.*

Only a very strained reading of the record would support the conclusion that Defendant Brands transferred the sheep to Defendant Wiley with the intent to benefit Plaintiffs. The evidence supports only the conclusion that Brands was seeking to make a profit, and the benefit, if any, that was to be conferred to Plaintiffs as a result of the Wiley/Brands transaction was

merely incidental. Recognizing that agreement as one "clearly and fully expressing an intent to confer a direct benefit" would, if taken to its logical extension, mean that any party in the downstream of commerce could bring a breach of contract claim against manufacturers and wholesale distributors with which they have no real relationship, merely be arguing that the plaintiff's consumption of the given product "benefits" her in some vague and tenuous sense. Such is obviously not the result contemplated by the third-party beneficiary exception to the privity rule. *See Veretto v. Eli Lilly & Co.*, 369 F. Supp. 1254, 1255 (N. D. Tex. 1974) ("As plaintiff bases his suit on a theory of breach of warranties, both express and implied, there can be no recovery of consequential economic damages from the remote manufacturer in this case because of the lack of privity of contract between them.").

Therefore, this argument is a reach and has no merit.

**B. Fraud**

In order to recover on their fraud claim, Plaintiffs must show: (1) that Brands made a material representation that was false; (2) that he knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) that he intended to induce Plaintiffs to act upon the representation; and (4) that Plaintiffs actually and justifiably relied upon the representation and thereby suffered injury. *Ernst & Young, L.L.P.*, 51 S.W.3d 573, 577 (Tex. 2001).

In moving for summary judgment, Defendant Brands relies on the fact that "all of the representations, even allegedly false ones, were made by [D]efendant Cash Wiley." [Dkt. No. 71-1 at 11]. Thus, a threshold question is whether the fact that Defendant Brands did not have any direct dealings with Plaintiffs precludes his liability for fraud. The answer is "no."

In Texas, "fraud jurisprudence has traditionally focused not on whether a misrepresentation is directly transmitted to a known person alleged to be in privity with the fraudfeasor, but on whether the misrepresentation was intended to reach a third person and induce reliance." *Ernst & Young, L.L.P.*, 51 S.W.3d at 578 (citing *Gainesville Nat'l Bank v. Bamberger*, 13 S.W. 959 (Tex. 1890)). Thus, Plaintiffs' fraud claim can survive summary judgment if there is evidence in the record raising a genuine issue of material fact as to whether Defendant Brands knowingly made a misrepresentation to Defendant Wiley with the intent to induce Plaintiffs' reliance.

Although the record is thin as to whether Brands knew that his claims to Wiley of the animals' purity were false when made, there is evidence in the record to support such a finding. First, Defendant Brands admitted in his deposition that he was told by Christopher Atkinson, a wildlife biologist, that the sheep appeared to be hybrids. [Dkt. No. 71-8 at 13]. Importantly, Brands admits that Atkinson made this observation while on Brands' propery before Brands transferred possession of the sheep to Defendant Wiley for ultimate sale to Plaintiffs. [Dkt. No. 71-8 at 29-30]. Regarding inducement, Brands admits that although he "sold" Wiley the sheep, he did not receive payment for them until Wiley sold them to the ultimate customers, Plaintiffs. [Dkt. No. 71-8 at 3]. This helps show that Brands hoped that both Defendant Wiley and Plaintiffs would be induced into believing the sheep were purebred. Given this evidence, as well as the fact that determinations of credibility are traditionally the province of the jury, the Court finds that there is a genuine issue as to whether Defendant Brands had the requisite culpability. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000) ("The jury, with its ability to listen to live testimony, [is] in a better position to judge the credibility of the witnesses and the accounts of the events . . . ."); *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 181 (5th

7

Cir. 2005) (Stewart, J., dissenting) (referring to credibility determinations as "a traditional jury province").

Lastly, Plaintiffs clearly relied on representations by Wiley that the sheep were purebred, and that reliance gave rise to an injury—namely, the difference in value of the hybrid sheep and that of the purebred sheep Plaintiffs believed they were purchasing. Therefore, the Court concludes that a genuine issue of material fact exists as to whether Defendant Brands is liable for fraud.

### C. Quasi-Contract and Plaintiffs' Cumulative Equity Claims

Defendant Brands next moves for summary judgment as to Plaintiffs' claim of breach of implied contract, also termed "quasi-contract." [Dkt. No. 71-1 at 4]. Plaintiffs, in response, argue that privity is not a necessary element of this claim, and therefore summary judgment is not warranted as to this claim, even if the court finds that such is appropriate for their standard contract claim. [Dkt. No. 84-1, ¶¶ 29-31].

Plaintiff correctly quotes Texas caselaw for the notion that "privity is unnecessary since the cause of action involves a promise implied in law, as opposed to one arising by [actual] consent" of the parties. [Dkt. No. 84-1, ¶ 30 (quoting *Tri-State Chemicals, Inc. v. Western Organics, Inc.*, 83 S.W.3d 189, 199 n.7 (Tex. App.—Amarillo 2002, writ denied)]. However, Plaintiffs are mistaken in invoking this claim as one that resurrects their true contract claim. [*See* Dkt. No. 84-1, ¶ 29 ("Plaintiffs incorporate by reference all the elements and claims established above for its breach of contract claim.")]. As the Texas Supreme Court has made clear, a quasi-contract "is not a peculiar brand of contract . . . it is not a contract at all but an obligation imposed by law to do justice even though it is clear that no promise was ever made or intended." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (quoting Calamari e*t al.*, THE LAW OF CONTRACTS § 1-12 (3d. ed. 1987)). Based on the nature of this claim, the Texas Supreme Court has

8

concluded that "[t]he principal function of quasi-contract is generally said to be that of prevention of *unjust enrichment*," (and, conversely, "[u]njust enrichment claims are based on quasi-contract,") *id.* at 683 (emphasis added); *See also Transamerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex. App.—San Antonio 1996, writ denied) ("Unjust enrichment characterizes the result of failing to make restitution for benefits received under circumstances giving rise to an implied or quasi-contract."); *Burlington N. R.R. v. Southwestern Elec. Power*, 925 S.W.2d 92, 96-97 (Tex. App.—Texarkana 1996, writ denied) ("The doctrine of unjust enrichment belongs to the measure of damages known as quasi-contract or restitution.); *id.* ("When a defendant has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon the defendant to restore the benefits to the plaintiff."); ("Quasi-contractual obligations are imposed by the courts for the purpose of bringing about a just result without reference to the intention of the parties."); *Caton v. Leach Corp.*, 896 F.2d 939, 947 (5th Cir. 1990) ("Under Texas law, . . . [t]he *quantum meruit* count is founded upon a theory of unjust enrichment . . . ."); Williston, 1 A TREATISE ON THE LAW OF CONTRACTS § 1:6 (R. Lord ed., 4th ed. 1990). Accordingly, the best reading of Texas caselaw yields the conclusion that Plaintiffs' implied contract and unjust enrichment claims collapse into one and are, at least for present purposes, identical.

In addition to unjust enrichment and implied contract, Plaintiffs invoke yet another common-law equity doctrine. "Assumpsit is a recovery for the unjust retention of a benefit to the loss of another, or the retention of money of another against the fundamental principals of justice and equity". *King v. Tubb*, 551 S.W.2d 436, 442 (Tex. App.—Corpus Christi 1977, no writ); *see also Fun Time Centers, Inc. v. Continental National Bank of Fort Worth* 517 S.W.2d 877 (Tex. Civ. App.—Tyler 1974, writ ref'd n.r.e.). "Where one seeks a recovery in assumpsit . . . the

complaining party must only show that the defendant holds money which in equity and good conscience belongs to the plaintiff". *Id.*; *see also Staats v. Miller*, 243 S.W.2d 686 (Tex. 1951). Thus, recovery based on assumpsit implies the existence of "a quasi-contractual obligation to repay funds advanced for another's benefit." *Id.* at 442; *see also Fun Time Centers*, 551 S.W.2d at 442. It follows that "where a benefit is received and accepted, the promise to pay for such benefit will be implied in law." *Id.*; *see also Resendiz v. Resendiz*, 367 S.W.2d 220 (Tex. Civ. App.—San Antonio 1963, no writ).

As is made apparent from the caselaw excerpts, whatever theoretical difference separates the claims of implied contract, unjust enrichment, and assumpsit, they are, at least for present purposes, interchangeable doctrines. Accordingly, the Court addresses all three of Plaintiffs' equity claims as one.

As a preliminary matter, both parties fail to address the threshold issue of whether Plaintiffs' equity claims can co-exist in a suit that simultaneously alleges breach of contract. Texas courts have repeatedly held that "[w]here there exists a valid express contract covering the subject matter, there can be no implied contract." *Woodard v. S.W. States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964)*, see also Lone Star Steel Co. v. Scott*, 759 S.W.2d 144, 154 (Tex. App. 1988 ("Recovery on either unjust enrichment or *quantum meruit* is recovery on a quasi-contract or a contract implied in law, and there can be no recovery on either if the same subject is covered by an express contract".). This reading makes sense in light of the premise that inspired the rule: that "parties should be bound by their express agreements." *Fortune Prod. Co.*, 52 S.W.3d at 684.

The Court has already decided, *supra*, that there is insufficient evidence to show that a contract existed between Plaintiffs and Defendant Brands. However, Plaintiffs did indeed have a

10

contract with Defendant Wiley.[1] Further, that contract governed the very subject matter giving rise to Plaintiffs' equity claims against Defendant Brands. As such, the difference between the present case and those in which the above rule has been reiterated is that, here, Plaintiffs' contract was with a *separate Defendant*. However, this fact makes no difference, as Texas courts have already established that such mutual claim exclusion is "applicable not only when the plaintiff is seeking to recover in *quantum meruit* from the party with whom he expressly contracted, but also . . . when the plaintiff is seeking recovery from a third party foreign to the original contract but who benefited from its performance." *W & W Oil Co. v. Capps*, 784 S.W.2d 536, 537 (Tex. App.—Tyler 1990, no writ); *See also Iron Mt. Bison Ranch, Inc. v. Easley Trailer Mfg., Inc.*, 42 S.W.3d 149, 160 (Tex. App.—Amarillo 2000, no writ) (same).

Thus, the Court need not continue to evaluate the factual viability of Plaintiffs' claims of unjust enrichment, assumpsit, and implied contract, because recovery under any of these theories, as a matter of law, is precluded by Plaintiffs' contract with Defendant Wiley.

**D. Civil Conspiracy**

"A civil conspiracy involves a combination of two or more persons with an unlawful purpose or a lawful purpose to be accomplished by unlawful means." *Ernst & Young*, 51 S.W.3d at 583. Further, "[f]raud is [an] unlawful purpose or means that [may] form[] the basis of a civil conspiracy claim . . . ." *Id.* Thus, having found that Plaintiffs' predicate claim of fraud on which

---

[1] As stated, the rule only applies when the contract in question is an *express* contract. The contract here was not reduced to writing, but it is nevertheless an "express contract." According to § 4 of the Restatement of Contracts, comment (a), "express contracts" are those where the parties' intentions are "manifested in language," as opposed to *implied* contracts, involving agreements manifested via the parties' "conduct." *See also* BLACK'S LAW DICTIONARY 345 (8th ed. 2004) (defining an "express contract as one "whose terms the parties have explicitly set out . . . ."); *Staley v. Taylor*, 165 Ore. App. 256, 262 (Or. Ct. App. 2000) ("In an express contract, the parties manifest their agreement by their words, *whether written or spoken*. In an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct. Other than questions of proof, the two types of contracts have the same legal effect.") (emphasis added).

11

their conspiracy claim depends can survive summary judgment, the present inquiry is whether Plaintiffs can satisfy the other elements of a conspiracy claim; namely: (1) that Brands combined with another Defendant to commit the aforementioned fraud; (2) that there was "a meeting of minds" between Brands and other Defendants to complete the fraud; (3) that an alleged conspirator committed at least one overt act to further the conspiracy; and (4) damages as the proximate result of the fraud. *See Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).

Assuming the existence of the predicate fraud, statements made by both Defendant Wiley and Brands in their respective depositions raises a fact issue as to whether both Defendants executed that fraud as co-conspirators. For example, rather than outright selling the sheep to Defendant Wiley, Defendant Brands and Wiley, according to the latter, "split 50/50" the proceeds of the sale to Plaintiffs. [Dkt. No. 71-12 at 9, 11]. Further, although Defendant Brands cannot be said to have been in privity with Plaintiffs, Defendant Wiley has suggested that his relationship with Defendant Brands in the transaction was a "partnership." [Dkt. No. 71-12 at 10]; [*but see* Dkt. No. 71-12 at 12 (Defendant Wiley recanting)]. Additionally, both Defendants admit that Plaintiffs' payments were wired directly to Defendant Brands' bank account rather than to Wiley's. [Dkt. No. 71-12 at 24]; [Doc. No. 71-8 at 3]. Thus, evidence exists in the record that plausibly demonstrates a combination of, and a meeting of minds between, Defendants Wiley and Brands to effectuate the illegal purpose.

As for the "overt act" prong, such is satisfied by the actual completion of the allegedly fraudulent transaction by Defendants. Lastly, as has already been established, there is evidence in the record that Plaintiffs have suffered injury as a result of the alleged enterprise. Therefore, Plaintiffs' claim of civil conspiracy can survive summary judgment.

### E. Conversion

"Conversion is the unauthorized and unlawful exercise of dominion and control over the personal property of another to the exclusion of, and inconsistent with, the owner's rights in the property . . . ." *Armstrong v. Benavides*, 180 S.W.3d 359, 363 (Tex. App.—Dallas 2005, no pet. h.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971); and *Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 39 (Tex. App.—Dallas 2003, pet. denied)).

When the subject of an alleged conversion is money, a plaintiff does not state an adequate claim merely by asserting that the defendant owes him money, or that the defendant "ripped him off." Rather, since the theory of conversion by definition centers on the right to possession of specific tangible property, "[a]n action will lie for conversion of money [only] when its identification is possible and there is an obligation to deliver the specific money in question, or otherwise particularly treat specific money." *Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 775 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.). In other words, the cause of action "must be supported by title in the plaintiff and there must be a means of identification of it as *a specific chattel* for it to constitute the subject of conversion." *Id.* (emphasis added). An example of a viable conversion of money claim is one involving funds that are "delivered for safe keeping, to which the keeper claims no title and which money is required and intended to be kept segregated, substantially in the form in which it was received or as an intact fund." *Id.* Importantly for present purposes, "[a] suit for conversion will not lie where a debtor-creditor relationship is created by deposit of a check to the depositor's account, because when deposited the money becomes the property of the bank." *Id.*

It is undisputed that, in this case, Plaintiffs transferred the relevant funds to Defendant Brands' bank account, [Dkt. No. 71-7 at 31-32], and that, subsequently, Brands transferred a

portion of those funds to Wiley, [Dkt. No. 71-7 at 39]. The funds are presumably now integrated with the balance of the respective accounts, and cannot be identified as specific chattel. Rather, the funds exist only as abstractions, represented by numbers on an account statement. This reality effectively converts Plaintiffs' "conversion" claim into a cumulative claim of unjust enrichment/quasi-contract/assumpsit; *i.e.*, that Defendants, in all fairness, owe Plaintiffs money. Such is insufficient to sustain a conversion of money claim.

### F. Theft

Plaintiffs bring their last claim under the Texas Theft Liability Act, which has created what is termed a "civil theft statute." *Texas Commerce Bank v. Robin New, et al.*, 3 S.W.3d 515, 516 (Tex. 1999). Texas Civil Practice and Remedies Code § 134.003(a) provides that "[a] person who commits theft is liable for the damages resulting from the theft." "Theft," in turn, is defined by § 134.002(2) as "unlawfully appropriating property or unlawfully obtaining services as described [in the Texas] Penal Code." Therefore, since the statute looks to the Texas Penal Code to define "theft," there must be evidence in the record to create a genuine issue as to whether Defendant Brands' conduct conformed to each element of at least one form of criminal theft.

Plaintiffs rely on § 31.03(a) and (b) of the Penal Code as the operative provision, [Dkt. No. 84-1, ¶ 53], which provides that a person commits theft if "he unlawfully appropriates property with intent to deprive the owner" thereof.

Appropriation of property is "unlawful" if: (1) "it is without the owner's effective consent;" or (2) "the property is stolen and the actor appropriates the property knowing it was stolen by another . . . ."

Per § 31.01(3)(A), consent is "ineffective" if it is "induced by deception or coercion." "Deception" is further defined as "creating or confirming by words or conduct a false impression

14

of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;" or, alternatively, a person engages in deception by "failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true . . . ." Tex. Pen. Code § 31.01(1).

Intuition may lead one to focus excessively on the fact that here, unlike in the prototypical "theft" scenario, Plaintiffs paid Defendant Brands willingly. However, as was established in the fraud discussion, *supra*, there is evidence in the record to support Plaintiffs' allegation that Defendant Brands made material misrepresentations with the goal of inducing Plaintiffs into relying on such for his own gain. If Plaintiffs transferred the relevant funds to Brands' bank account in reliance on those misrepresentations, it would follow that Brands "appropriated" the funds without Plaintiffs' "effective consent," thereby rendering the appropriation "unlawful." It would be no answer that Defendant Brands could not have been the party who unlawfully "appropriated" the money because it was Defendant Wiley, not Brands, who mislead Plaintiffs. As established by the Texas Penal Code, appropriation is "unlawful" even without a showing of ineffective consent if "the property is stolen and the actor appropriates the property knowing it was stolen by another . . . ." The fraud case against Defendant Wiley is much stronger than it is against Defendant Brands, since Wiley was the contracting party with Plaintiffs and was the person who led Plaintiffs to believe that the sheep were purebred. Therefore, the record reflects the existence of a genuine fact issue as to whether *Defendant Wiley* is liable for theft. Since Defendant Brands admits to receiving Plaintiffs' appropriated property—their money—on behalf of Wiley, he arguably "appropriated property knowing it was stolen by another." Therefore, there exists a genuine fact issue as to whether *Defendant Brands* is liable to Plaintiffs for theft.

### IV. CONCLUSION

Defendant Brands' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' breach of contract, conversion, unjust enrichment, assumpsit, and breach of implied contract claims. As to Plaintiffs' remaining claims of fraud, civil conspiracy, and theft, Defendants Craig Brands' Motion for Summary Judgment is **DENIED**.

IT IS SO ORDERED.

DONE this 11th day of December, 2006, in Laredo, Texas.

_____
Micaela Alvarez
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**